UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NEUTRINO DEVELOPMENT CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-01-2484 |
| SONOSITE, INC., | § § § | |
| Defendant. | § | |

**MEMORANDUM & ORDER**

Pending before the Court is Plaintiff Neutrino Development Corporation's ("Neutrino") Motion to Disqualify SonoSite's Expert Walter Bratic (Dkt. # 247). The Court, having considered the motion, the responses of the parties, and the applicable law, is of the opinion that the motion should be DENIED.

**Factual Background[1]**

Neutrino's motion asserts that Richard Redano, acting as Neutrino's general counsel, began contacting and interviewing prospective consulting experts who could assist Neutrino in its analysis and presentation of a damages case shortly after the original complaint was filed in 2001. Among the firms contacted by Redano was Technology and Dispute Resolution Consulting, Inc., which later became known as InteCap. In response to his inquiries, Redano was contacted by Jim Barolak, the Director of InteCap, who agreed to send Redano some written materials describing the experience of InteCap with patent litigation issues. Redano also provided Barolak with

---

[1]The factual and procedural background relating to the case at bar has been discussed at length in previous orders. This order, therefore, will address only the factual background of the pending motion.

information to run a preliminary conflicts check before proceeding with any discussions between InteCap and Neutrino.

In August 2001, Redano received a letter and information packet from Barolak. A meeting was then scheduled at InteCap's office to discuss further details. Neutrino, through the declaration of Richard Redano, asserts that the meeting was to discuss strategy issues and the type of expert assistance that Neutrino was seeking. The meeting took place in September 2001. Redano met with Shirley Webster, the Managing Director of InteCap, at the firm's downtown Houston office. At the meeting, Redano asserts that he revealed confidential information regarding Neutrino's litigation strategy and attorney-work product relating to Neutrino's claims against SonoSite. Redano's declaration states that this information included: (1) Neutrino's business strategy for commercializing the technology embodied in the patent in suit; (2) Neutrino's beliefs and thought processes as to how SonoSite's infringement of the '021 patent harmed that strategy; and (3) potential methodologies and strategies for evaluating and presenting damage and irreparable harm evidence as a result of SonoSite's infringement. Redano asserts that he formed an "objectively reasonable" expectation that InteCap would regard any confidential and strategic information disclosed by Redano on behalf of Neutrino as confidential. He further asserts in his declaration that neither he nor Neutrino ever consented to disclosure of the confidences revealed to InteCap at this meeting.

Redano asserts that the outcome of this initial consultation was that Webster recommended C.P.A. Walter Bratic, Vice Chairman of InteCap, as a prospective consulting expert for Neutrino. Redano asserts that Bratic's credentials were discussed, as were his billing rates and testifying experience.

**Discussion**

Federal courts have the inherent power to disqualify experts, although cases that grant disqualification are rare. *Koch Refining Co. v. Jennifer L. Boudreau M/V*, 85 F.3d 1178 (5th Cir. 1996) (internal citations omitted). "[N]o one would seriously contend that a court should permit a consultant to serve as one party's expert where it is undisputed that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification." *Id.* (quoting *Wang Lab., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D.Va.1991)). In disqualification cases other than those in which the expert clearly switched sides, the Fifth Circuit Court of Appeals in *Koch* found that "lower courts have rejected a 'bright-line' rule and have adopted the following test: First, was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the expert?" *Id.* (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D. D.C.1991) (reviewing cases)). Only if the answers to both questions are affirmative should the witness be disqualified. *Id.* (citing *Mayer*, 139 F.R.D. at 3). The Fifth Circuit recognized that other courts have also considered a third element: the public interest in allowing or not allowing an expert to testify. *Id.* (citing *English Feedlot Inc. v. Norden Lab, Inc.*, 833 F. Supp. 1498, 1504-5 (D. Colo. 1993); *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F. Supp. 334, 336-37 (N.D. Ill. 1990)).

The party seeking disqualification bears the burden of proving these elements. *Koch,* 85 F.3d at 1182. Initially, a court must determine whether the retaining party and the expert had "a relationship which permitted [the retaining party] reasonably to expect that any communication . . . would be maintained in confidence by [the expert]." *Id.* (citing *In re Ambassador Group, Inc.*

3

*Litigation*, 879 F. Supp. 237, 243 (E.D.N.Y. 1994)). Lower courts have found such a relationship to exist when "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like." *Id.* (quoting *Marvin Lumber Co. v. Norton*, 113 F.R.D. 588, 591 (D. Minn. 1986)); *see also Wang Lab*., 762 F.Supp. at 1249, n. 4 (collecting cases); *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 581 (D.N.J. 1994). By contrast, when "the expert met but once with counsel, was not retained, was not supplied with specific data relevant to the case, and was not requested to perform any services, [ ] reviewing court[s] [have] found that the evidence supports the finding that the meeting was a type of informal consultation rather than the commencement of a long-term relationship." *See Id.* (quoting *Mayer,* 139 F.R.D. at 3-4 (internal quotations and citations omitted)). *See also Wang Lab.*, 762 F. Supp. at 1249, n. 5 (collecting cases); *Nikkal Ind., Ltd. v. Salton*, 689 F.Supp. 187, 190 (S.D.N.Y. 1988).

The Fifth Circuit in *Koch* further recognized that other courts have also "balance[d] the competing policy objectives in determining expert disqualification." *Koch*, 85 F.3d at 1182 (quoting *English Feedlot*, 833 F. Supp. at 1504). "The policy objectives favoring disqualification include preventing conflicts of interest and maintaining the integrity of the judicial process." *Id*. (quoting *English Feedlot*, 833 F. Supp. at 1504-5).  Conversely, "the main policy objectives militating against disqualification are ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling." *Id.* "Courts have also expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party." *Id*. (quoting *English Feedlot*, 833 F. Supp. at 1505).  Accordingly, courts have considered whether another expert is

available and whether the opposing party had time to hire him or her before trial. *E.g., Wyatt v. Hanan*, 871 F. Supp. 415, 422 (M.D. Ala. 1994); *Cordy*, 156 F.R.D. at 582.

In this case, it does not seem clear that Neutrino has met either of its burdens in this case. First, there was apparently only one meeting between Redano and any member from InteCap. As the district court determined in *Mays v. Reassure America Life Ins. Co.*,

> [i]n the 60 to 90 minute meeting, it is highly unlikely that there was any detailed or involved discussion concerning litigation strategies, the strengths and weaknesses of each side, the witnesses to be called, the types of experts to be retained and anticipated defenses, particularly as the discussion centered on the work of an administrator and the practicalities of the CPA Firm assuming that role.

293 F. Supp. 2d 954, 957 (E.D. Ark. 2003). Second, Redano has not met his burden of establishing that a confidential relationship of any kind was established with Bratic or that information passed between Webster or Barolak and Bratic concerning Neutrino's patent litigation. There is no indication that Redano, or anyone else from Neutrino, ever spoke with or provided information of any kind either directly or indirectly to Walter Bratic. At best, Redano's declaration asserts that he shared confidential information of a specific nature with Shirley Webster. Webster, however, has stated in her declaration, that she did not share this information with Bratic. Furthermore, Bratic has stated in his declaration that he did not receive any information, confidential or otherwise, from either Webster or Barolak regarding Redano's conversations with them. Additionally, Neutrino has not made any showing that it made its intentions clear at the outset of the initial meeting that a confidential relationship was presumed to exist. As the district court in *Wang Laboratories* noted, "lawyers bear a burden to make clear to consultants that retention and a confidential relationship are desired and intended." 762 F. Supp. at 1250. In *English Feedlot*, the district court expanded on this idea by stating that the agreement should be in writing and that the writing should clearly define the consultant's confidentiality

obligation. 833 F. Supp. 1505. The court further noted that a consultant who has doubts about his desire to be retained should express those doubts prior to the confidential information being shared.

In this case, however, there is no evidence that Redano expressly or impliedly informed any member of InteCap that he desired the information he gave them to be kept confidential. At the time the meeting occurred, Neutrino had not retained InteCap or any of its individual members as an expert in this case. Furthermore, it was Neutrino and Redano, not InteCap or its officers, who eventually decided that the expert should not be retained. Thus, absent some showing that there was an understanding reached as to the confidentiality of the information shared, the Court is unwilling to find the existence of a confidential relationship which would warrant Bratic's exclusion.

It is so ORDERED.

Signed this 1st day of August, 2005.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE